324 S.E.2d 99

**Edith ALLEN, Marguerite Francisco, Virginia Lucas, Henry Clay Moore, and Peggy Haid**

v.

**STATE of West Virginia HUMAN RIGHTS COMMISSION, and Howard D. Kenney, the Executive Director of the West Virginia Human Rights Commission.**

No. 16303.

Supreme Court of Appeals of West Virginia.

Dec. 6, 1984.

Mike Kelly, Charleston, for petitioners.

Gail Ferguson, Asst. Atty. Gen., Charleston, for respondents.

Jane Moran, Williamson, for amicus curiae Now & Nat'l. Council of Jewish Women & W.Va. Civil Liberties Union.

James E. Williams, Lonesome, Price & Williams, Charleston, Cheryl L. Henderson, Henderson & Henderson, Huntington, Grant Crandall, Crandall, Pyles & Crandall, Charleston, Sharon Mullens, Cross Lanes, Joseph Franklin Long, Bluefield, Allan N. Karlin, Morgantown, for amicus curiae, W.Va. State Conference of Branches of Nat'l. Assoc. for Advancement of Colored People & Mountain State Bar Assoc.

McGRAW, Justice:

The petitioners in this mandamus action, four individuals who have filed complaints with the West Virginia Human Rights Commission, and one individual who has attempted to file a complaint with the Commission, seek to compel the Commission, and its Executive Director, Howard D. Kenney, to: (1) accept complaints which meet criteria established in the statute and in rules and regulations promulgated by the agency; (2) employ at least one full-time hearing examiner to conduct public hearings; (3) promptly investigate all complaints filed; (4) conduct an immediate conciliation conference following probable cause determinations on all complaints filed; (5) hold public hearings within a reasonable time following probable cause determinations on all complaints filed; (6) promptly dispose of a number of docketed cases which are hampering the operation of the agency's administrative machinery; and (7) reimburse them for attorneys fees and other costs associated with the prosecution of this mandamus action. Following a brief description of the status of each petitioner's complaint before the Human Rights Commission; a discussion of the appropriateness of mandamus in this case; and an analysis of the structure and function of the Human Rights Commission, each of the issues raised by the petitioners will be addressed.

I

*Edith Allen*

In 1974, and for several years thereafter, petitioner Edith Allen, a black female, filed applications for employment with the Union Carbide Corporation at its South Charleston and Institute plants. On February 2, 1977, the petitioner filed a complaint with the Human Rights Commission, charging that Union Carbide had failed to hire her on the basis of race when it hired white applicants with comparable training and experience. On January 11, 1979, almost two years after her complaint was filed, the Human Rights Commission determined that there was probable cause to believe her charge of race discrimination, stating that its investigation revealed a set of circumstances which "strongly support the findings of Probable Cause based on race discrimination in employment." Despite this finding of probable cause, no further action was taken by the Commission for over four years. Finally, the petitioner's complaint was scheduled for hearing on February 24, 1983. This hearing, however, was not held on the date scheduled, but was rescheduled for June 6, 1983. This rescheduled hearing was also continued generally with no specific hearing date set. Although the Human Rights Commission

indicated, following institution of this mandamus action in April 1984, that a hearing might be held in August 1984, one was not scheduled because of the unavailability of a hearing examiner. It has now been over seven years since the petitioner filed her complaint with the Human Rights Commission.

### Marguerite Francisco and Virginia Lucas

On January 6, 1979, petitioners Marguerite Francisco and Virginia Lucas, who were then fifty-one and fifty-eight years of age respectively, were notified by their employer, Thorofare Markets, Inc., that it was closing its Pennyfare store in St. Albans where they worked on January 13, 1979. Petitioner Francisco had been employed at that same location by a number of supermarket operators for twenty-nine years, and petitioner Lucas had been employed at that same location for twenty-seven years. The next day, they were notified by their union that it had accepted a "package deal" which required the petitioners, along with other female employees, to either transfer to a distant Thorofare store or to resign in return for $4000.00 in severance pay. This "deal," negotiated by the union without the knowledge or consent of the petitioners, allowed male employees, who were younger and had less seniority, to remain at the Pennyfare location in St. Albans. On February 27, 1979, the Human Rights Commission docketed complaints from the petitioners charging Thorofare and Pennyfare with unlawful sex and age discrimination. On March 14, 1979, similar complaints were filed against the petitioners' union local. On February 1, 1982, almost three years after the petitioners' complaints had been filed, the Human Rights Commission determined that there was probable cause to believe that Thorofare had engaged in unlawful age and sex discrimination. A similar probable cause determination was issued against the Food Store Employees Union, Local 347, on April 5, 1982. The petitioners' complaints were scheduled for hearings to begin on August 11, 1982. These hearings were continued, however, on the motion of the union. The hearings were rescheduled for October 26, 1982. Again, these hearings were continued, this time on the motion of Thorofare. The hearings were rescheduled for December 14, 1982. These hearings were also continued on motion of the Commission. Finally, on February 22, 1983, over four years after the initiation of these discrimination actions, hearings began on the complaints of Francisco and Lucas. These hearings, however, lasted only one day, without the testimony of either the petitioners, the employer or its witnesses, or the union or its witnesses. Instead, the matter was continued generally, and has not been resumed or rescheduled. It has now been over five years since the petitioners filed their complaints against Thorofare, Pennyfare, and their former union with the Human Rights Commission.

### Henry Clay Moore

Beginning in January 1979 and ending in December 1979, petitioner Henry Clay Moore, a black male, applied for employment with the United States Steel Corporation at its mine at Thacker in Mingo County. He alleges that he renewed his application there every three months; that he had successfully completed a miner's training class; and that he had experience with machinery utilized in the mining industry. Each time he renewed his application for employment, however, the petitioner alleges that he was informed that the company was not hiring. In March 1980, the petitioner learned that United States Steel had hired several white applicants at its Thacker mine over the previous fifteen months who were less qualified. After the petitioner threatened legal action, he was offered employment. On April 29, 1980, the Human Rights Commission docketed a complaint filed by the petitioner charging United States Steel with race discrimination and seeking backpay for the period during which he was unlawfully denied employment on the basis of race. On May 26, 1981, over one year after the complaint was filed, the Human Rights Commission determined that there was probable cause to believe that United States Steel had en-

gaged in unlawful race discrimination. Despite this finding of probable cause, however, no further action has been taken by the Human Rights Commission regarding the petitioner's complaint. It has now been over four years since the petitioner filed his complaint with the Human Rights Commission.

### Peggy Haid

On January 12, 1984, petitioner Peggy Haid, a white female lab assistant with the Union Carbide Corporation at its South Charleston plant, noticed the posting of an announcement for the employment of a lab technician at the South Charleston plant. Because she had been employed at Union Carbide as a lab assistant since June 1981, and because of the higher salary associated with the position of lab technician, the petitioner filed a timely bid for this opening. She was, however, neither interviewed nor informed as to the status of her bid. Rather, she later learned that a male employee, whom she believed to be less qualified, had been promoted to the position. On April 6, 1984, a representative of the petitioner's attorney attempted to file the petitioner's complaint, which met all the criteria set forth in the statute and in agency rules, with the Commission. The representative was denied the right to file this petition, however, on the ground that the petitioner had another complaint against Union Carbide pending before the Commission. Subsequently, on May 22, 1984, the Executive Director of the Commission acknowledged, in a letter sent to the petitioner, that the complaint sought to be filed on April 6, 1984, "concerned a different issue," and should have been docketed. He still maintains, however, that the Commission may reject certain complaints for "various reasons."

Unfortunately, these difficulties in the disposition of complaints filed with the Human Rights Commission are far from isolated.[1] As of April 30, 1984, there was

---

1. In a petition to intervene as parties to this mandamus action, two other individuals who have filed complaints with the Human Rights Commission submit affidavits chronicling experiences similar to those suffered by the petitioners.

Douglas T. Davis, a black male, veteran of World War II and the Korean conflict, joined the West Virginia Army National Guard in 1963. As a member of the Guard, he volunteered to assist in the recruitment of blacks because of their underrepresentation in the Army National Guard. He also states that he raised the issue of racial discrimination with his immediate superiors and others in the chain of command. On May 3, 1969, he was notified that his application for reinstatement had been rejected and that he was discharged from duty. At the time of his discharge, he was an operations intelligence sergeant, master sergeant E–8. On September 8, 1969, the Human Rights Commission determined that there was probable cause to believe that his discharge was based upon race and that there was a pattern and practice of race discrimination in the West Virginia Army National Guard. Subsequently, Sgt. Davis joined the United States Army Reserve, of which he is still a member. In fact, in 1976, he was promoted to Chief Warrant Officer, the highest Army Reserve rank for a noncommissioned officer. It has now been over fifteen years since Sgt. Davis filed his complaint with the Human Rights Commission charging the West Virginia Army National Guard with race discrimination in employment, and despite telephoning the Human Rights Commission approximately every six months for over fifteen years, nothing has been done.

Richard H. Fuller, a black male, was formerly employed by the Consolidation Coal Company in Monongalia County for ten years. In 1979, while working at Consolidation Coal's Pursglove No. 15 mine, he states that he became the subject of racial slurs by his supervisors. He also states that racial slurs were painted on the sides of railroad cars used at the mine. He alleges that although he complained about these racial slurs to the mine superintendent, no action was taken. A short time later, Mr. Fuller took a leave of absence from work due to an illness which he attributes, in part, to the stress associated with racial harassment in the workplace. On June 12, 1984, he was discharged for allegedly using profane and threatening language when he attempted to ascertain the reason for the late payment of his sick leave benefits a few days earlier. On August 25, 1981, the Human Rights Commission docketed his complaint charging Consolidation Coal Company with race discrimination. Eighteen months later, on February 23, 1983, the Human Rights Commission determined that probable cause existed to believe that Consolidation Coal Company had engaged in unlawful race discrimination. It has now been over three years since Mr. Fuller filed his complaint with the Human Rights Commission, and nothing has been done. Mr. Fuller states in his affidavit that:

I have been unable to obtain decent and comparable employment and I have grown increasingly depressed by the delay in resolving

what the Human Rights Commission refers to as an "inventory"[2] of 1672 pending cases. Of this group, no action had been taken on 327 complaints; investigation had begun on 676 complaints; and probable cause determinations had been made on 669 complaints. Yet, in fiscal year 1983, the most recent year in which complete data is available, only 15 hearings were held. In fact, from fiscal year 1974 to fiscal year 1983, a total of 70 hearings have been held, or an average of 7 per year, on a total of 5207 complaints, or an average of 520.7 complaints filed per year. It is surprising, given these figures, that the Human Rights Commission's "inventory" is no greater than 1672 pending cases. These anonymous figures are also sadly reflected in the real frustration experienced by complainants, such as the petitioners, who wait indefinitely for action on their complaints of unlawful discrimination.

## II

A threshold issue we must address prior to our discussion of the major areas of concern raised by the petitioners is whether mandamus is an appropriate remedy for the relief sought. First, it is well established in this jurisdiction that "A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a clear legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969); *see also Reed v. Hansbarger,* 173 W.Va. 258, 314 S.E.2d 616, 619–20 (1984), and cases cited therein.[3] The first two elements of this formula require an analysis of the legal rights and duties of the respective parties. At this point, it is sufficient that the petitioners are complainants under an antidiscrimination adjudicatory system administered by the respondents. As to the third element, the respondents maintain that the private cause of action under West Virginia Code § 5–11–13 (Supp.1984) provides an adequate alternative remedy for the petitioners in this case.[4] This Court has long

---

my case. All I want is justice and a chance to be heard. Every two and a half months, I see my doctor, Rolly Sullivan, about my feelings and high blood pressure. I understand that he thinks the delay in resolving my case hurts my blood pressure and contributes to my depression and family problems. I agree, but I don't know what to do to make things better. I am terribly frustrated by the delay.

**2.** Unfortunately, agency utilization of this Orwellianesque term for the backlog of complaints filed by individuals claiming violation of their fundamental human and civil rights reflects a bureaucratic detachment displayed by the agency towards its important mission which is found elsewhere in the record.

**3.** *See also* Syl. pt. 3, *State ex rel. Norton v. Stone,* 173 W.Va. 179, 313 S.E.2d 456 (1984); *State ex rel. Cabell County Deputy Sheriff's Association v. Dunfee,* 163 W.Va. 539, 540, 258 S.E.2d 117, 118 (1979); Syl. pt. 2, *McGrady v. Callaghan,* 161 W.Va. 180, 244 S.E.2d 793 (1978); Syl. pt. 4, *Delardas v. County Court,* 158 W.Va. 1027, 217 S.E.2d 75 (1975); Syl. pt. 2, *Traverse Corp. v. Latimer,* 157 W.Va. 855, 205 S.E.2d 133 (1974); Syl. pt. 1, *Hall v. Protan,* 156 W.Va. 562, 195 S.E.2d 380 (1973); Syl. pt. 1, *Fairlawn Homes, Inc. v. City of Morgantown,* 155 W.Va. 172, 182 S.E.2d 48 (1971); Syl., *State ex rel. Lynn v. Pryor,* 154 W.Va. 555, 177 S.E.2d 33 (1970); *State ex rel. Hercules Tire & Rubber Supply Co. v. Gore,* 152 W.Va. 76, 84, 159 S.E.2d 801, 806

(1968); *State ex rel. Damron v. Ferrell,* 149 W.Va. 773, 776–77, 143 S.E.2d 469, 472 (1965).

**4.** In support of this argument, the respondents focus primarily upon the availability of attorney and witnesses fees in private causes of action under West Virginia Code § 5–11–13 (Supp. 1984). Although additional cost is certainly one factor which diminishes the attractiveness of private causes of action as alternatives to the pursuit of administrative remedies, there are other factors that also operate to the detriment of those seeking relief for violations of their human and civil rights through private causes of action. First, potential litigants may experience difficulty in securing competent counsel to pursue their civil avenues of relief. As was stated in Note, *Civil Rights—Administrative Enforcement—Damages as an Appropriate Remedy,* 75 W.Va.L.Rev. 253, 253 (1973): "Without the probability of a substantial judgment to attract legal counsel, many disadvantaged persons could find themselves financially unable to protect their rights from the numerous small wrongs that can form the frustrating pattern of discrimination." Second, potential litigants must sacrifice the availability of administrative hearing examiners who are experienced in the area of civil rights in favor of circuit judges who are generally less familiar with the intricacies of civil rights law. Finally, circuit courts are less equipped to make preliminary determinations as to the potential success of civil rights actions

recognized, however, that, "Mandamus will not be denied on the ground that there is another remedy unless such other remedy is equally convenient, beneficial, and effective." Syl. pt. 5, *Hardin v. Foglesong,* 117 W.Va. 544, 186 S.E. 308 (1936).[5] When faced with similar circumstances in *Walls v. Miller,* 162 W.Va. 563, 566–67, 251 S.E.2d 491, 495 (1978), this Court stated that:

> [W]e find in the case before us that the alleged deprivations of petitioner's rights are capable of being repeated under numerous variations of a basic recurring factual pattern, in spite of all other available administrative and legal remedies if no definitive resolutions of these issues are provided by this Court.

Despite the availability of a private cause of action, the repetitiousness of the alleged noncompliance with legal duties imposed upon the respondents and the concomitant violation of the legal rights of the petitioners minimize the effectiveness of individual private causes of action, particularly when the relief sought in this mandamus action would inure to the benefit of a large class of persons who could not otherwise obtain similar relief individually in the context of actions for damages under the West Virginia Human Rights Act.

The respondents further contend, with respect to the appropriateness of mandamus in this proceeding, that the petitioners seek to compel certain actions which the agency regards as within its exclusive discretion. Specifically, the respondents maintain that the imposition of time limitations within which certain activities must be performed would impermissibly impinge upon agency discretion in the execution of various agency functions. In effect, they assert that, in the absence of clearly defined legislatively imposed time limitations, administrative agencies possess unfettered discretion in the alacrity with which they perform mandatory duties.

It is generally recognized that, "Mandamus cannot be employed ordinarily to control official discretion." Syl., *Reynolds v. State Road Commission,* 111 W.Va. 398, 162 S.E. 319 (1932).[6] There are, however, two important exceptions to this

---

than are investigators for the Human Rights Commission who make probable cause determinations after a preliminary factfinding process. The respondents' own statistical data submitted in this proceeding demonstrates the diminished utility of private causes of action in civil rights cases. Between April 1, 1983 and April 1, 1984, the Human Rights Commission issued 2,400 right-to-sue notices. During this one year period, only 70, or 2.9 percent, of these cases were filed in circuit court.

**5.** *See also* Syl. pt. 4, *United Mine Workers of America v. Scott,* 173 W.Va. 356, 315 S.E.2d 614 (1984); Syl. pt. 2, *Meadows v. Lewis,* 172 W.Va. 457, 307 S.E.2d 625 (1983); *United Mine Workers of America v. Miller,* 170 W.Va. 177, 291 S.E.2d 673, 677 (1982); Syl. pt. 3, *Perry v. Barker,* 169 W.Va. 531, 289 S.E.2d 423 (1982); Syl. pt. 4, *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981); *Snyder v. Callaghan,* 168 W.Va. 265, 284 S.E.2d 241, 253 (1981); *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622, 628–29 (1981); *Myers v. Barte,* 167 W.Va. 194, 279 S.E.2d 406, 409 (1981); Syl. pt. 1, *State ex rel. Lemley v. Roberts,* 164 W.Va. 457, 260 S.E.2d 850 (1979), *overruled on other grounds, Stalnaker v. Roberts,* 168 W.Va. 593, 287 S.E.2d 166, 169 (1981); Syl. pt. 1, *State ex rel. Board of Education v. Dyer,* 154 W.Va. 840, 179 S.E.2d 577 (1971); Syl. pt. 2, *State ex rel. C.J. Langenfelder & Son, Inc. v. Ritchie,* 154 W.Va. 825, 179 S.E.2d 591 (1971); Syl. pt. 2, *State ex rel. Smoleski v. County Court,* 153 W.Va. 307, 168 S.E.2d 521 (1969); Syl. pt. 2, *State ex rel. Allstate Ins. Co. v. Union Public Service Dist.,* 151 W.Va. 207, 151 S.E.2d 102 (1966); *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 573, 136 S.E.2d 783 (1964); Syl. pt. 2, *State ex rel. Wheeling Downs Racing Ass'n v. Perry,* 148 W.Va. 68, 132 S.E.2d 922 (1963); Syl. pt. 1, *State ex rel. Myers v. Straughan,* 144 W.Va. 452, 108 S.E.2d 565 (1959); Syl. pt. 3, *State ex rel. Vance v. Arthur,* 142 W.Va. 737, 98 S.E.2d 418 (1957), *overruled on other grounds, Stalnaker v. Roberts,* 287 S.E.2d at 169; Syl. pt. 2, *Stowers v. Blackburn,* 141 W.Va. 328, 90 S.E.2d 277 (1956); Syl. pt. 1, *Carter v. City of Bluefield,* 132 W.Va. 881, 54 S.E.2d 747 (1949); *State ex rel. Lawhead v. County Court,* 129 W.Va. 167, 169, 38 S.E.2d 897, 898 (1946); Syl. pt. 1, *State ex rel. Miller v. Board of Education,* 126 W.Va. 248, 27 S.E.2d 599 (1943); Syl. pt. 3, *State v. Carpenter,* 106 W.Va. 170, 171, 145 S.E. 184 (1928); Syl. pt. 5, *City of Philippi v. Tygarts Valley Water Co.,* 99 W.Va. 473, 129 S.E. 465 (1925); Syl. pt. 2, *State ex rel. City of Benwood v. Benwood & MeMechen Water Co.,* 94 W.Va. 724, 120 S.E. 918 (1924); Syl. pt. 1, *State ex rel. Hall v. County Court,* 82 W.Va. 564, 96 S.E. 966 (1918); *Eureka Pipe Line Co. v. Riggs,* 75 W.Va. 353, 356, 83 S.E. 1020, 1021–22 (1915).

**6.** *See also State ex rel. Board of Education v. Spillers,* 164 W.Va. 453, 259 S.E.2d 417, 419 (1979).

general rule. First, "caprice, passion, partiality, fraud, arbitrary conduct, some ulterior motive, or misapprehension of law" will permit compulsion of discretionary activity by writ of mandamus. *See Bailey v. Truby,* 174 W.Va. 8, 321 S.E.2d 302, 307 (1984).[7] Second, "a writ of mandamus is the proper remedy to compel the tribunals and officers exercising discretion and judicial power to act, when they fail so to do, in violation of their duty...." Syl. pt. 3, *Meador v. County Court,* 141 W.Va. 96, 87 S.E.2d 725 (1955).[8] The petitioners allege both a misapprehension of the law with respect to the timely performance of agency functions and extraordinary delay amounting to, for all practical purposes,[9] a complete failure to act. Unquestionably, discretion may be abused, and that abuse may be remedied by writ of mandamus. As the incredible delays in the disposition of complaints before the Human Rights Commission as evidenced by the experience of the petitioners in the present action demonstrate, agency discretion has been exercised to effectuate agency inaction. Therefore, we must analyze the issue of administrative delay in the processing of complaints before the Human Rights Commission in order to determine at what point discretion ends and duty begins.[10]

7. *See also* Syl. pt. 6, *Mountaineer Disposal Service v. Dyer,* 156 W.Va. 766, 197 S.E.2d 111 (1973); Syl. pt. 4, *Walter v. Ritchie,* 156 W.Va. 98, 191 S.E.2d 275 (W.Va.1972); Syl. pt. 3, *State ex rel. Bowen v. Flowers,* 155 W.Va. 389, 184 S.E.2d 611 (1971); Syl., *State ex rel. Board of Education v. Miller,* 153 W.Va. 414, 168 S.E.2d 820 (1969); *State ex rel. Canterbury v. County Court,* 151 W.Va. 1013, 1019, 158 S.E.2d 151, 155 (1967); Syl. pt. 4, *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 136 S.E.2d 783 (1964); Syl. pt. 2, *State ex rel. Printing-Litho, Inc. v. Wilson,* 147 W.Va. 415, 128 S.E.2d 449 (1962); Syl. pt. 2, *Backus v. Abbot,* 136 W.Va. 891, 69 S.E.2d 48 (1952); Syl., *Beverly Grill, Inc. v. Crow,* 133 W.Va. 214, 57 S.E.2d 244 (1949); Syl., *State ex rel. Lykens v. Bouchelle,* 122 W.Va. 498, 11 S.E.2d 119 (1940); *State ex rel. Dillon v. Neal,* 104 W.Va. 259, 265, 139 S.E. 757, 760 (1927).

8. *See also Patterson v. Aldredge,* 317 S.E.2d 805, 807 (W.Va.1984), and cases cited therein; *Cochran v. Trussler,* 141 W.Va. 130, 134, 89 S.E.2d 306, 309 (1955); *State ex rel. Ward v. County Court,* 138 W.Va. 551, 555–56, 76 S.E.2d 579, 582 (1953); *State ex rel. Burford v. McKee,* 135 W.Va. 18, 24, 62 S.E.2d 281, 284 (1951); Syl. pt. 1, *Robertson v. Warth,* 132 W.Va. 398, 52 S.E.2d 237 (1949); Syl. pt. 3, *Poling v. Board of Education,* 50 W.Va. 374, 40 S.E. 357 (1901); *Hebb v. Cayton,* 45 W.Va. 578, 579, 32 S.E. 187, 188 (1898); Syl. pt. 2, *Wheeling Bridge & Terminal Ry. Co. v. Paull,* 39 W.Va. 142, 19 S.E. 551 (1894); *Satterlee v. Strider,* 31 W.Va. 781, 789, 8 S.E. 552, 557 (1888); Syl. pt. 10, *State ex rel. Miller v. Buchanan,* 24 W.Va. 362 (1884); Syl. pt. 2, *Board of Supervisors v. Minturn,* 4 W.Va. 300 (1870).

9. In *Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093, 1099 (D.C.Cir.1970), the court stated, "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."

10. It is well settled in this jurisdiction that "A peremptory writ of mandamus will issue to require the discharge by a public official of a non-discretionary duty." Syl. pt. 4, *Glover v. Sims,* 121 W.Va. 407, 3 S.E.2d 612 (1939); *see also Reed v. Hansbarger,* 314 S.E.2d 616, 620 (W.Va.1984), and cases cited therein; *see also* Syl. pt. 3, *State ex rel. Godby v. Hager,* 154 W.Va. 606, 177 S.E.2d 556 (1970); Syl. pt. 1, *State ex rel. Bache & Co. v. Gainer,* 154 W.Va. 499, 177 S.E.2d 10 (1970); *State ex rel. Hughes v. Board of Education,* 154 W.Va. 107, 124, 174 S.E.2d 711, 722 (1970); *State ex rel. Judy v. Kiger,* 153 W.Va. 764, 768, 172 S.E.2d 579, 582 (1970); Syl. pt. 1, *State ex rel. West Virginia Housing Development Authority v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969); Syl. pt. 3, *State ex rel. Greenbrier County Airport Authority v. Hanna,* 151 W.Va. 479, 153 S.E.2d 284 (1967); Syl. pt. 1, *State ex rel. Allstate Insurance Co. v. Union Public Service District,* 151 W.Va. 207, 151 S.E.2d 102 (1966); *State ex rel. Raese v. Battle,* 149 W.Va. 761, 765, 143 S.E.2d 328, 331 (1965), *overruled on other grounds, Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 881–82 (1979); Syl. pt. 1, *State ex rel. Smith v. Kelly,* 149 W.Va. 381, 141 S.E.2d 142 (1965); Syl. pt. 1, *State ex rel. Island Creek Coal Co. v. Hanley,* 149 W.Va. 107, 138 S.E.2d 848 (1964); *State ex rel. Yahn Electric Co. v. Baer,* 148 W.Va. 527, 534, 135 S.E.2d 687, 692 (1964); Syl. pt. 1, *State ex rel. Wheeling Downs Racing Association v. Perry,* 148 W.Va. 68, 132 S.E.2d 922 (1963); Syl. pt. 1, *State ex rel. Williams v. Board of Trustees of Policemen's Pension or Relief Fund,* 147 W.Va. 795, 131 S.E.2d 612 (1963); Syl. pt. 3, *W.E. Long Co.—Independent Bakers' Cooperative v. Burdett,* 147 W.Va. 177, 126 S.E.2d 181 (1962); *State ex rel. Jarrell v. Walker,* 145 W.Va. 815, 818, 117 S.E.2d 509, 511–12 (1960); Syl. pt. 2, *State ex rel. Schenerlein v. City of Wheeling,* 144 W.Va. 434, 108 S.E.2d 788 (1959), *overruled on other grounds; State ex rel. Summerfield v. Maxwell,* 148 W.Va. 535, 135 S.E.2d 741 (1964); Syl. pt. 1, *State ex rel. Zickefoose v. West,* 145 W.Va. 498,

### III

The Legislature has declared it "the public policy of the State of West Virginia to provide all of its citizens equal opportunity for employment, equal access to places of public accommodations, and equal opportunity in the sale, purchase, lease, rental and financing of housing accommodations or real property." West Virginia Code § 5–11–2 (Supp.1984). In defining the parameters of this fundamental concept of equal opportunity, the Legislature has stated that "equal opportunity" is the "human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, age, blindness or handicap" to employment, housing, and public accommodations. *Id.* This concept of equality is so basic to our system of government, that the Legislature has declared, "The denial of these rights to properly qualified persons by reason of race, religion, color, national origin, ancestry, sex, age, blindness or handicap is contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." *Id.* Therefore, every act of unlawful discrimination in employment, housing, or public accommodations is akin to an act of treason, undermining the very foundations of our democracy.

This fundamental concept of equal opportunity is also reflected in several of our constitutional provisions. First, West Virginia Constitution art. III, § 1 states the basic principle on which our entire democratic structure is founded:

> All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their prosterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety.

Second, West Virginia Constitution art. III, § 3 provides, "Government is instituted for the common benefit, protection and security of the people, nation or community." Third, West Virginia Constitution art. III, § 10 provides, "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his

116 S.E.2d 398 (1960), *overruled on other grounds, State ex rel. Booth v. Board of Ballot Commissioners,* 156 W.Va. 657, 677, 196 S.E.2d 299, 312 (1973); Syl. pt. 1, *State ex rel. Chambers v. County Court,* 145 W.Va. 581, 116 S.E.2d 125 (1960); *State ex rel. Myers v. Straughan,* 144 W.Va. 452, 454, 108 S.E.2d 565, 566 (1959); Syl. pt. 3, *State ex rel. Pitts v. Chambers,* 144 W.Va. 204, 107 S.E.2d 512 (1959); Syl. pt. 6, *State ex rel. Vance v. Arthur,* 142 W.Va. 737, 98 S.E.2d 418 (1957), *overruled on other grounds, Stalnaker v. Roberts,* 168 W.Va. at 599, 287 S.E.2d at 169; *State ex rel. Revercomb v. O'Brien,* 141 W.Va. 662, 674, 91 S.E.2d 865, 872 (1956); Syl. pt. 1, *Adams v. Londeree,* 139 W.Va. 748, 83 S.E.2d 127 (1954); Syl. pt. 3, *State ex rel. Board of Governors of West Virginia University v. Sims,* 140 W.Va. 64, 82 S.E.2d 321 (1954); *State ex rel. Ward v. County Court,* 138 W.Va. 551, 553, 76 S.E.2d 579, 581 (1953); Syl. pt. 2, *State ex rel. Commission on Interstate Cooperation v. Sims,* 135 W.Va. 257, 63 S.E.2d 524 (1951); Syl. pt. 4, *State ex rel. Board of Aeronautics v. Sims,* 129 W.Va. 694, 41 S.E.2d 506 (1947); Syl. pt. 1, *Draper v. Anderson,* 102 W.Va. 633, 135 S.E. 837 (1926); *State ex rel. Yost v. State Road Commission,* 96 W.Va. 184, 192, 122 S.E. 527, 530 (1924); Syl. pt. 2, *State ex rel. Hallanan v. Cyrus,* 83 W.Va. 30, 97 S.E. 412 (1918); Syl. pt. 5, *State ex rel. W.H. Wheeler & Co. v. Shawkey,* 80 W.Va. 638, 93 S.E. 759 (1917); Syl. pt. 1, *Frantz v. County Court,* 69 W.Va. 734, 73 S.E. 328 (1911);

*Capito v. Topping,* 65 W.Va. 587, 590, 64 S.E. 845, 846 (1909); Syl. pt. 9, *Mann v. County Court,* 58 W.Va. 651, 52 S.E. 776 (1906); *Stanton v. O'Kane,* 55 W.Va. 601, 602, 47 S.E. 245, 246 (1904); Syl. pt. 10, *Daniel v. Simms,* 49 W.Va. 554, 39 S.E. 690 (1901); Syl. pt. 1, *Summers County v. Monroe County,* 43 W.Va. 207, 27 S.E. 307 (1897); Syl. pt. 1, *Marcum v. Ballot Commissioners,* 42 W.Va. 263, 26 S.E. 281 (1896); Syl. pt. 2, *State ex rel. County Court of Herrald,* 36 W.Va. 721, 15 S.E. 974 (1892); *Ratcliffe v. County Court,* 36 W.Va. 202, 203–04, 14 S.E. 1004, 1004 (1892); *State ex rel. Boggs v. County Court,* 33 W.Va. 589, 593, 11 S.E. 72, 74 (1890); Syl. pt. 6, *Doolittle v. County Court,* 28 W.Va. 158 (1886); Syl. pt. 2, *Board of Supervisors v. Minturn,* 4 W.Va. 300 (1870). One general rule in determining where mandatory duty lies is that "The word 'shall' in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Syl. pt. 2, *Terry v. Sencindiver,* 153 W.Va. 651, 171 S.E.2d 480 (1969); *see also United Mine Workers of America v. Scott,* 173 W.Va. 356, 315 S.E.2d 614, 621 (1984), and cases cited therein; *In re Mann,* 151 W.Va. 644, 652, 154 S.E.2d 860, 864 (1967); *State ex rel. Staley v. County Court,* 137 W.Va. 431, 440, 73 S.E.2d 827, 832 (1953); *State ex rel. Boone County Coal Corp. v. Davis,* 133 W.Va. 540, 549, 56 S.E.2d 907, 913 (1950); Syl. pt. 8, *Baer v. Gore,* 79 W.Va. 50, 90 S.E. 530 (1916).

peers." Fourth, West Virginia Constitution art. III, § 17 provides, "The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." Finally, West Virginia Constitution art. III, § 20 provides, "Free government and the blessings of liberty can be preserved to any people only by a firm adherence to justice, moderation, temperance, frugality and virtue, and by a frequent recurrence to fundamental principles." Equal opportunity in this State is a fundamental principle which has its foundation in these constitutional provisions. The Human Rights Act breathes life into these constitutional provisions which mandate equal opportunity, imbuing administrative procedure before the Human Rights Commission with the same constitutional aura attendant to any other procedure which can culminate in a judicial proceeding.

Despite the lofty expressions of legislative policy, the development of an administrative mechanism for enforcing the concept of equal opportunity in the workplace and in the marketplace is a relatively recent phenomenon. In *Human Rights Commission v. Pauley*, 158 W.Va. 495, 498–500, 212 S.E.2d 77, 79 (1975), *overruled on other grounds, Human Rights Commission v. Pearlman Realty Agency*, 161 W.Va. 1, 5, 239 S.E.2d 145, 147 (1977), this Court traced the development of the enforcement power of the Human Rights Commission. This effort to place teeth in what was previously token legislation was an important step in the evolution of the concept of equal opportunity in this State. As was stated by Justice Caplan in *Pauley*, 158 W.Va. at 499–500, 212 S.E.2d at 79:

> [I]t is readily discernible that the Legislature, by its recent enactments in the field of human rights, intended to and did

provide the Commission the means with which to effectively enforce the law and meaningfully implement the legislative declaration of policy. If our society and government seriously desire to stamp out the evil of unlawful discrimination which is symptomatic of unbridled bigotry, and we believe they do, then it is imperative that the duty of enforcement be accompanied by an effective and meaningful means of enforcement. The forceful language used by the Legislature mandates the eradication of unlawful discrimination. If this mandate is to be carried to fruition the provisions of the 1967 Human Rights Act and the amendments thereto must be given the significance intended so as to provide for meaningful enforcement.

■ The administrative mechanism developed by the Legislature to enforce its mandate is relatively straightforward. The initiation of proceedings before the Human Rights Commission is precipitated by the filing of a complaint by "[a]ny individual claiming to be aggrieved by an alleged unlawful discriminatory practice[11] ... *within ninety days* after the alleged act of discrimination." West Virginia Code § 5–11–10 (1979 Replacement Vol.) (Emphasis added). The Legislature has mandated that "[a]fter the filing of any complaint ... the commission shall make *prompt* investigation in connection therewith." *Id.* (Emphasis added). The purpose of this investigation is to determine whether "probable cause exists for substantiating the allegations of the complaint." *Id.* If, after completing its investigation, it is determined that no probable cause exists, "the commission shall, *within ten days* from such determination, cause to be issued and served upon the complainant written notice of such determination." *Id.* (Emphasis added).[12] If, after completing its investigation,

---

11. "Unlawful discriminatory practice[s]" under the Human Rights Act are defined in West Virginia Code § 5–11–9 (Supp.1984).

12. After receipt of such notice of determination that probable cause does not exist to substantiate the allegations of the complaint, the "complainant or his attorney may, *within ten days* after such service, file with the commission a written request for a meeting with the commission to show probable cause for substantiating the allegations of the complaint." West Virginia Code § 5–11–10 (1979 Replacement Vol.) (Emphasis added).

it is determined that probable cause does exist to substantiate the allegations of the complaint, "the commission shall *immediately endeavor* to eliminate the unlawful discriminatory practices complained of by conference, conciliation and persuasion." *Id.* (Emphasis added). The Legislature then has provided that "[i]n case of failure so to eliminate such practice *or in advance thereof,* if in the judgment of the commission circumstances so warrant, the commission shall cause to be issued and served a written notice . . . requiring the . . . respondent[ ] to answer the charges of such complaint at a hearing. . . ." *Id.* (Emphasis added).[13] This written notice must "be served at least *thirty days* prior to the time set for the hearing." *Id.* (Emphasis added).

At the hearing,[14] the complainant's case is presented before the Commission "by one of its attorneys or agents." West Virginia Code § 5–11–10 (1979 Replacement Vol.). The respondent may "appear at such hearing in person or otherwise, with or without counsel, and submit testimony and evidence." *Id.* Upon conclusion of such hearing, the statute provides that if "the commission shall find that a respondent has engaged in . . . any unlawful discriminatory practice . . . the commission shall issue and cause to be served . . . an order to cease and desist . . . and to take such affirmative action . . . as in the judgment of the commission, will effectuate the purposes of this article. . . ." *Id.* Conversely, the statute provides that if "the commission shall find that a respondent has not engaged in such unlawful discriminatory practice, the commission shall state its findings of fact and conclusions of law . . . and shall issue and cause to be served

on the complainant an order dismissing the said complaint as to such respondent." *Id.*

Several features of this legislatively designed structure for the processing of complaints before the Human Rights Commission are particularly noteworthy. First, unlike ordinary civil litigation, complaints before the Human Rights Commission are scrutinized in order to determine whether probable cause, traditionally the test for determining the legitimacy of complaints of criminal conduct, exists to substantiate the allegations in those complaints. This, however, to a certain extent, parallels the gatekeeping function performed by private attorneys who, prior to filing civil actions in the appropriate forum, determine the validity of complaints advanced by potential litigants, and is related to the role served by the Commission in furnishing legal representation to complainants who reach the hearing stage of the administrative process. Second, voluntary compliance with our antidiscrimination laws is sought through a conciliation mechanism, although the Commission's role at this stage of the proceedings is an active one, "immediately endeavor[ing] to eliminate the unlawful discriminatory practices complained of." West Virginia Code § 5–11–10 (1979 Replacement Vol.). This, to a certain extent, parallels the role performed by judges in the pretrial process, where settlements are sought to avoid the time and expense associated with protracted litigation. Third, the foundation on which the entire administrative structure is built is the ultimate disposition of complaints of unlawful discrimination through the adjudicatory hearing process. Without at least the potential, if not the likelihood, of a hearing on the merits of complaints of unlawful discrimination, the remainder of the administrative process is

**13.** This duty to proceed to public hearing upon failure of conciliation efforts is nondiscretionary. As this Court stated in the single Syllabus Point of *Currey v. Human Rights Commission,* 166 W.Va. 163, 273 S.E.2d 77 (1980), "After an investigating commissioner's finding of probable cause to credit a timely complaint to the West Virginia Human Rights Commission as true, and failure of conference and conciliation efforts, the commission has a statutory, nondiscretionary duty to proceed to hearing on the charge. Code, 5–11–10."

**14.** Except as specifically provided to the contrary, West Virginia Code § 5–11–10 (1979 Replacement Vol.) provides that all of the pertinent provisions of the West Virginia Administrative Procedure Act, West Virginia Code §§ 29A–5–1–5 (1980 Replacement Vol.), "shall apply to and govern the hearing and the administrative procedures in connection with and following such hearing."

rendered a meaningless exercise in chest thumping. Anyone with more than a cursory knowledge of the dynamics of any litigation has undoubtedly noted the substantial correlation between decreases in time before trial and increases in the number of settlements. With no hearing there can be no sanctions, with no sanctions there is no incentive to conciliate, with no incentive to conciliate there is no reason to investigate, with no reason to investigate there is no reason to complain, with no reason to complain there is no reason for the administrative agency to exist. Finally, the Legislature has clearly expressed its desire that the processing of complaints before the Human Rights Commission be as expeditious as possible. Complaints must be filed "within ninety days" of alleged acts of discrimination; the Commission must make a "prompt" [15] investigation of those complaints; once a probable cause determination is made the Commission must either notify the complainant of an adverse determination "within ten days" or "immediately" endeavor to eliminate unlawful discrimination upon a favorable determination that probable cause exists; the Commission is authorized to proceed directly to hearing once probable cause is determined "in advance" of the conciliation process; and the notice of hearing period is limited to "thirty days." West Virginia Code § 5–11–10 (1979 Replacement Vol.). This concern with expeditiousness is a reflection of the dynamics of unlawful discrimination in the workplace and in the marketplace. Without swift administrative action in such areas as unlawful employment and housing discrimination, complainants may be effectively precluded appropriate relief by the positions sought being filled and the housing sought being sold or rented.

With the above discussion of the structure and function of the Human Rights Commission, we now turn to each of the issues raised by the petitioners.

IV

The first issue raised by the petitioners concerns the docketing of complaints which meet criteria established by statute and in rules and regulations promulgated by the Human Rights Commission. As previously noted, the Human Rights Commission refused to docket petitioner Haid's complaint on the ground that she had another complaint pending before the Commission against the same employer. Although the Executive Director subsequently acknowledged that petitioner Haid's complaint should have been docketed, he maintains that the Commission may reject proffered complaints for "various reasons."

West Virginia Code § 5–11–10 (1979 Replacement Vol.), governing the filing of complaints before the Human Rights Commission, provides:

Any individual claiming to be aggrieved by an alleged unlawful discriminatory practice shall make, sign and file with the commission a verified complaint, which shall state the name and address of the person, employer, labor organization, employment agency, owner, real estate broker, real estate salesman or financial institution alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the commission's rules and regulations.... Any complaint filed pursuant to this article must be filed within ninety days after the alleged act of discrimination.

There are no other statutory requirements with regard to the filing of complaints before the Human Rights Commission. Therefore, there is no lawful authority to support the Executive Director's contention that complaints which meet statutory and administrative criteria may be rejected by the Commission.

15. We note that, particularly given the verification requirement for complaints filed with the Human Rights Commission, findings of probable cause may, in many instances, be made on the face of the complaint, without resort to further investigation. This would be particularly true of complaints supported by numerous affidavits. This procedure would accelerate progress to an eventual evidentiary hearing.

 Under West Virginia Code § 5–11–10 (1979 Replacement Vol.), the Human Rights Commission has a mandatory duty to place on its docket all complaints tendered that meet five criteria: (1) verification; (2) name and address of the respondent; (3) description of the alleged discriminatory action or practice; (4) other information as required in rules and regulations promulgated by the Commission; and (5) filing within ninety days after the alleged act of discrimination. The respondents admit that petitioner Haid's complaint met these five criteria, and should have been docketed upon tender. Thus, the failure to docket the complaint was unlawful. We therefore hold that petitioner Haid's complaint should have been placed on the Human Rights Commission docket on April 6, 1984, the date it was first tendered to the Commission.

### V

The second issue raised by the petitioners concerns the employment of a full-time hearing examiner to conduct public hearings on behalf of the Human Rights Commission. West Virginia Code § 5–11–6 (1979 Replacement Vol.) provides, in pertinent part, that "The commission shall employ a hearing examiner who shall be an attorney, duly licensed to practice law in the State of West Virginia, for the conduct of the public hearings authorized in ... [§ 5–11–8(d)(3) ] of this article." As previously noted, "The word 'shall' in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Syl. pt. 2, *Terry v. Sencindiver*, 153 W.Va. 651, 171 S.E.2d 480 (1969).[16] Yet, despite the fact that a hearing examiner, as agent to be employed by the Commission to discharge its adjudicatory function, is the only position specifically mandated by the Legislature to be filled by the Human Rights Commission, no full-time hearing examiner has ever been employed in the history of the agency. This noncompliance with its fundamental duty to employ a full-time hearing examiner is central to the Commission's difficulty in disposing of docketed cases in a timely fashion. The Legislature has established the Human Rights Commission as an alternative to the prosecution of claims of unlawful discrimination through more expensive and time-consuming judicial proceedings. Therefore, the entire structure and function of the Human Rights Commission is designed to achieve the goal of a relatively inexpensive and expeditious administrative quasi-judicial proceeding. The key actor in this proceeding is the hearing examiner. Without a full-time hearing examiner, the Commission, its Executive Director, and its employees all perform vain acts, which ultimately serve no particular purpose other than self-justification.

 Since its inception, the Commission has secured its hearing examiners through contract with private attorneys on a part-time, fixed-fee basis. The respondents continue to defend this practice on several grounds. First, the respondents contend that the Commission cannot afford to hire a full-time hearing examiner.[17] As this Court stated, however, in *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781, 791 (1981), "lack of funds is not a valid excuse for denying ... society as a whole[ ] the constitutional right to the benefit of legislative enactments...." *See also Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625, 641 (1983); *Perry v. Barker*, 289 S.E.2d 423, 428–29 (W.Va.1982); *Moore v. Starcher*, 167 W.Va. 848, 280 S.E.2d 693, 696 (1981). Second, the respondents maintain that part-time hearing examiners are more impartial than a full-time hearing examiner would be. It is difficult to understand how a

---

**16.** *See also* footnote ten, *supra*.

**17.** With a backlog of almost 1700 cases, including almost 700 awaiting public hearing, it would appear that the Human Rights Commission cannot afford not to hire a full-time hearing examiner. Furthermore, this assertion flies in the face of the fact that hearing examiners are the only personnel specifically required by statute to be employed by the Human Rights Commission. *See* West Virginia Code § 5–11–6 (1979 Replacement Vol.). Hearing examiners are, in fact, the foundation upon which the entire administrative machinery of the Human Rights Commission is built.

part-time hearing examiner who sits in judgment on cases argued by fellow lawyers who normally practice in the same geographic area would be more impartial than a full-time hearing examiner whose professional activity is limited to service as a hearing examiner for the Human Rights Commission. Furthermore, the amount of expertise sacrificed in utilizing part-time hearing examiners who devote most of their time to the general practice of law as opposed to a full-time hearing examiner whose area of expertise would be limited to civil rights law is immeasurable. Finally, the respondents argue that a full-time hearing examiner would be underutilized because the Commission's funds are insufficient to cover the cost of hearings conducted. Lack of funds, however, as previously noted, is not a valid excuse for failure to perform nondiscretionary duties.[18]

In addition to the inadequacy of the arguments advanced by the respondents in support of the practice of employing part-time hearing examiners, testimony from a former part-time hearing examiner for the Human Rights Commission in this case illustrates other problems inherent in the part-time hearing examiner mechanism. First, it is often difficult to secure a hearing date given the exigencies that arise in the practice of law, particularly given the fact that some hearings may require more than one day of testimony. Second, given the lack of access to case files prior to thirty day hearing notices, part-time hearing examiners often have limited time within which to familiarize themselves with the facts and issues involved prior to the actual hearing. Finally, given the realities of the practice of law in some of the more rural areas, part-time hearing examiners must sometimes recuse themselves when they belatedly discover past or present professional relationships with either the complainant or the respondent. All of these factors contribute to the delay inherent in agency utilization of part-time hearing examiners. We therefore hold that under West Virginia Code § 5–11–6 (1979 Replacement Vol.), the Human Rights Commission has a mandatory duty to employ at least one full-time hearing examiner, who is an attorney duly licensed to practice law in the State of West Virginia, for the conduct of public hearings authorized under the West Virginia Human Rights Act. The hearing examiner must give precedence to his or her duties as hearing examiner over all other duties.

### VI

The next three issues raised by the petitioners all concern the expeditious processing of complaints before the Human Rights Commission. Basically, there are three steps in the Human Rights Commission dispositionary process: investigation, conciliation, and adjudication. As to the investigation stage, West Virginia Code § 5–11–10 (1979 Replacement Vol.) provides, "the commission shall make a prompt investigation." As to the conciliation stage, West Virginia Code § 5–11–10 (1979 Replacement Vol.) provides, "the commission shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion." Finally, as to the

---

18. We note that the Human Rights Commission has apparently contracted with free-lance court reporters in order to fulfill the reporting requirements imposed by the Administrative Procedure Act. We also note, however, that under the Administrative Procedure Act, "All of the testimony and evidence at any such hearing shall be reported by stenographic notes and characters *or by mechanical means.*" West Virginia Code § 29A–5–1(a) (1980 Replacement Vol.). (Emphasis added). Furthermore, West Virginia Code § 29A–5–1(a) (1980 Replacement Vol.) provides that, "it shall not be necessary to transcribe the reported testimony unless required for purposes of rehearing or judicial review." Therefore, there appears to be appropriate avenues for the minimization of costs associated with reporting testimony. On October 30, 1984, this Court adopted and promulgated a Court Reporter Manual, which regulates court reporting and which includes provisions governing electronic recording devices. The Human Rights Commission should be guided by this Court Reporter Manual, and should use electronic recording device operators who will be temporarily employed and supervised by the Administrative Director of the Supreme Court of Appeals until July 1, 1985, at which time the Human Rights Commission must have completed the personnel and budgetary adjustments necessary to assume full financial responsibility for such operators.

adjudication stage, West Virginia Code § 5-11-10 (1979 Replacement Vol.) provides, "[i]n case of failure so to eliminate such practice or in advance thereof . . . the commission shall cause to be issued and served a written notice . . . to answer the charges of such complaint at a hearing." Although all three of these provisions mandate the expeditious completion of each step in the dispositionary process, the petitioners' experiences and statistics submitted by the agency indicate that the Human Rights Commission has failed to comply with these nondiscretionary duties.

Despite the statutory requirement of "prompt" investigation, which is defined as "performed readily or immediately" in Webster's New Collegiate Dictionary 914 (1979) and as "responding instantly" in Webster's Third New International Dictionary (1970), the Human Rights Commission has consistently failed to complete its investigation of complaints for extraordinary periods of time. The investigation of complaints filed by petitioners Francisco and Lucas took almost three years to complete, the investigation of the complaint filed by petitioner Allen took almost two years to complete, and the investigation of the complaint filed by petitioner Moore took over one year to complete, such negligence is inexcusable! A statistical analysis of sample cases filed in fiscal year 1983 (July 1, 1982—June 30, 1983), submitted by the respondents in this proceeding, demonstrates that delay occurs both in the commencement and in the completion of investigations. Of 189 sample cases filed in fiscal year 1983, 32 were not yet under investigation almost one year later on May 18, 1984. In other words, almost 17 percent of the sample cases filed in fiscal year 1983 were not yet under investigation almost one year later. Of 124 sample cases which had proceeded to investigation as of May 18, 1984, the mean number of days between filing and the start of investigation was calculated to be 97.9 days. With a standard deviation of 98.6 days, however, on this figure, along with the exclusion of 17 percent of the sample cases on which investigations

had not yet commenced, the actual lapse between the filing of complaints with the Human Rights Commission and the commencement of investigations upon those complaints is much greater in a large number of cases. Nevertheless, even with a statistical sample most favorable to the agency, the analysis provided by the respondents demonstrates an inordinate delay in the start of investigations on complaints filed. The second area of delay in the investigatory process is the actual completion of investigations once commenced. Despite the fact that the statistical analysis submitted by the respondents asserts that 118 of the 189 sample cases had been closed by May 18, 1984, it identifies only 37 cases for which a date on which investigation began and a date on which investigation concluded could be located.[19] Of this group, the mean length of investigation was 170.4 days, with a standard deviation of 107.7 days. Again, even with a statistical sample most favorable to the agency, excluding cases still under investigation for example, the analysis provided by the respondents demonstrates an inordinate delay in the completion of investigations once commenced. Furthermore, the statistical study identifies a gap between determinations of probable cause and administrative closures which might create further delay. Of 44 cases which had both closure and probable cause determination dates, the mean length of time lapsed was 67.3 days, with a standard deviation of 92.5 days.

Despite the statutory mandate that the Commission "immediately endeavor" upon a finding of probable cause to eliminate the unlawful discriminatory practice through the conciliation process, it has consistently failed to begin or complete conciliation efforts within a reasonable time. The respondents admit that, "There may be a delay of up to 30 days in starting the process of conciliation." It is unclear how this delay affects the application of Rule 4.09 promulgated by the Human Rights Commission which provides that, "Failure to arrive at a satisfactory adjustment with-

---

**19.** This inability to account administratively for the history of complaints before the agency re-

flects a lack of coordination between agency functions.

in forty-five (45) days after respondent is notified in writing of a finding of probable cause may constitute sufficient reason for the Commission to determine efforts at conference and conciliation to be a failure." [20] Nevertheless, it is clear, as evidenced by the experience of the petitioners, that the period between determination of probable cause and notice of hearing is commonly longer than 45 days. Probable cause was determined on petitioner Allen's complaint in January 1979, a hearing on that complaint was not scheduled until January 1983. Probable cause was determined on petitioners Francisco's and Lucas's complaints in February and April 1982, hearings on these complaints were not scheduled until July 1983. Probable cause was determined on petitioner Moore's complaint in May 1981, a hearing on that complaint still has not been scheduled. Without question, thirty days is not "immediately" and, certainly, four years is not "immediately."

Finally, in spite of the statutory requirement that a thirty day notice of hearing issue on the failure of conciliation efforts, or earlier in the process if the Commission determines that the circumstances so warrant,[21] and in spite of agency rule that failure at conciliation efforts occurs forty-five days after determination that probable cause exists, the performance of the Human Rights Commission with regard to the conduct of hearings has been tragic. Even after the agency issues favorable probable cause determinations, complainants must wait not a matter of days, nor a matter of weeks, nor a matter

of months, but a matter of years before their complaints of unlawful discrimination are heard by the Human Rights Commission. In the statistical study of sample cases filed in fiscal year 1983, not a single case had proceeded to public hearing almost one year later on May 18, 1984. In a separate analysis of 80 cases which had proceeded to public hearing, the mean length of time between filing date and hearing date was 1283 days, with a standard deviation of 725 days. Furthermore, no case filed after fiscal year 1979, ending June 30, 1979, was found to have reached public hearing as of May 18, 1984. The study further reveals that the performance of the agency in processing complaints to public hearing has grown progressively worse over the years. The mean length of time between filing date and hearing date for complaints filed between fiscal year 1967 and fiscal year 1973 was 948 days, with a standard deviation of 653 days. The mean length of time between filing date and hearing date for complaints filed between fiscal year 1974 and fiscal year 1976 was 1433 days, with a standard deviation of 912 days. Finally, the mean length of time between filing date and hearing date for complaints filed between fiscal year 1977 and fiscal year 1979 was 1410 days, with a standard deviation of 593 days. Because no case filed after fiscal year 1979 has reached the hearing stage, a complaint of unlawful discrimination filed on July 1, 1979, would still have been pending hearing 1783 days later, almost five years, on May 18, 1984. Furthermore, even after a hearing was held on 61 complaints which had

20. Because this conciliation period is triggered only by a determination that probable cause exists, its availability is merely a matter of convenience for respondents. Rather than placing a great deal of emphasis on the conciliatory phase, the Commission should emphasize the adjudicatory phase. The legislature's intention that the opportunity to conciliate be provided only as a matter of convenience is clearly reflected in its grant of authority to the Commission to completely bypass this stage of the proceedings. *See* West Virginia Code § 5–11–10 (1979 Replacement Vol.). Therefore, the forty-five day period for conciliation provided in Rule 4.09 seems a bit excessive. We further note that there is no provision for the grant of continuances in the conciliation phase, and given the

limited nature of the conciliation process, none would be appropriate. Finally, given the severe limitation on available resources, we note that field conciliation conferences, which involve unnecessary travel expenses, can needlessly result in the depletion of these precious funds.

21. We note that under this "in advance thereof" provision in West Virginia Code § 5–11–10 (1979 Replacement Vol.), the Human Rights Commission should issue a notice of hearing immediately upon determination of probable cause, and then utilize the intervening time to attempt conciliation, thereby expediting the hearing process.

156

both proceeded to hearing and which had resulted in closure, the mean interval between the commencement of the hearing and the date of closure, either through final order of the Commission or through settlement, was 487 days, with a standard deviation of 286 days.

In addition to the statutory implications of the extraordinary delays in processing complaints by the Human Rights Commission, constitutional provisions guaranteeing certain procedural due process protections are also implicated. This State's procedural due process provision, West Virginia Constitution art. III, § 10, states that, "No person shall be deprived of life, liberty, or property, without due process of law...." An important element of this procedural due process guaranty is found in West Virginia Constitution art. III, § 17, which provides that "justice shall be administered without ... delay." Therefore, "due process of law implies not merely an opportunity to be heard, but also opportunity to be heard with reasonable promptness...." 16A Am.Jur.2d *Constitutional Law* § 844, at 1049–50 (1979).

Recently, in Syllabus Point 1 of *State ex rel. Patterson v. Aldredge*, 173 W.Va. 446, 317 S.E.2d 805 (1984), this Court held that:

Under article III, § 17 of the West Virginia Constitution, which provides that "justice shall be administered without sale, denial or delay," and under Canon 3A(5) of the West Virginia Judicial Code of Ethics (1982 Replacement Vol.), which provides that "A judge should dispose promptly of the business of the court," judges have an affirmative duty to render timely decisions on matters properly submitted within a reasonable time following their submission.

In *Patterson*, 173 W.Va. at 448, 317 S.E.2d at 808, this Court concluded that a thirty-three month delay between initial hearing and the filing of the mandamus action to compel a decision was unreasonable and justified the issuance of a writ of mandamus commanding rendition of a decision. *See also State ex rel. Cackowska v. Knapp*, 147 W.Va. 699, 700–01, 130 S.E.2d 204, 205 (1963) (seventeen month delay in

rendering a decision warranted issuance of writ of mandamus compelling decision).

This Court has also consistently held that administrative delay may be subject to a writ of mandamus compelling action. In the single Syllabus Point of *Village of Bridgeport v. Public Service Commission*, 125 W.Va. 342, 24 S.E.2d 285 (1943), this Court stated: "When the Public Service Commission expressly declines to act in a matter properly pending before it for a named reason which does not justify its refusal, this Court by a peremptory writ of mandamus will require it to proceed therein." In Syllabus Point 2 of *State ex rel. Sheppe v. Board of Dental Examiners*, 147 W.Va. 473, 128 S.E.2d 620 (1962), this Court held that, "In the absence of a specific time limit, the failure of a state board or agency to take decisive action with a reasonable time, upon a matter properly before it, will be assumed to be a refusal of the action sought." In Syllabus Point 3 of *State ex rel. Bowen v. Flowers*, 155 W.Va. 389, 184 S.E.2d 611 (1971), involving the suspension of a pharmacist from participation in pharmaceutical programs administered by the Department of Welfare, this Court stated, "Where a suspension is justified prior to a hearing, the refusal to hold a hearing after a reasonable time has elapsed in which to conduct a proper investigation constitutes *arbitrary* or *capricious* action on the part of the administrative officer involved." Finally, in *Kanawha Valley Transportation Co. v. Public Service Commission*, 159 W.Va. 88, 95, 219 S.E.2d 332, 338 (1975), this Court stated, "It is true that cases before the Public Service Commission should be promptly disposed of. This principle applies to any administrative body or court...."

In Syllabus Point 2 of *State ex rel. Ellis v. Kelly*, 145 W.Va. 70, 112 S.E.2d 641 (1953), this Court recognized that, "Due process of law, within the meaning of the State and Federal constitutional provisions, extends to actions of administrative officers and tribunals, as well as to the judicial branches of the governments." *See also* Syl. pt. 5, *State ex rel. Bowen v. Flowers*, *supra*; Syl. pt. 2, *State ex rel. Gooden v. Bonar*, 155 W.Va. 202, 183 S.E.2d 697 (1971); Syl. pt. 1, *Smith v. Siders*, 155

W.Va. 193, 183 S.E.2d 433 (1971). The interrelationship between procedural due process and administrative promptness can be seen from this Court's reliance in *State ex rel. Bowen v. Flowers*, 155 W.Va. at 394, 184 S.E.2d at 614, upon Syllabus Point 2 of *State ex rel. Ellis v. Kelly, supra,* in holding that unreasonable administrative delay warranted issuance of a writ of mandamus.[22] We therefore hold that under West Virginia Constitution art. III, § 10,

which provides that "No person shall be deprived of life, liberty, or property, without due process of law ...," and under West Virginia Constitution art. III, § 17, which provides that "justice shall be administered without ... delay," administrative agencies performing quasi-judicial functions have an affirmative duty to dispose promptly of matters properly submitted.[23]

The procedural due process right to the prompt disposition of matters pending be-

**22.** Other courts have recognized the interrelationship between administrative promptness and procedural due process. In *Smith v. Illinois Bell Telephone Co.,* 270 U.S. 587, 591, 46 S.Ct. 408, 410, 70 L.Ed. 747, 749 (1926), the United States Supreme Court stated, "Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them." In *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965), the Court stated, "A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 14 L.Ed. 1363, 1369 (1914). It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *See also Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976); *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287, 299 (1970). In *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521, 529 (1975), in the context of a unemployment benefit case, the Court stated, "Prompt and adequate administrative review provides an opportunity for consideration and correction of errors made in initial eligibility determinations. Thus, the rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process." In *Barry v. Barchi,* 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365, 376 (1979), the Court overturned the administrative suspension of a harness racehorse trainer's license because "the provision for an administrative hearing, neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues."

Federal courts are frequently confronted with administrative delays which raise procedural due process issues. *See Brown v. Bathke,* 566 F.2d 588, 592 (8th Cir.1977) (delay in post-termination hearing violated procedural due process); *Quintana v. Harris,* 491 F.Supp. 1044, 1047 (D.N.M.1980), *rev'd and remanded on other grounds sub nom., Quintana v. Califano,* 623 F.2d 128 (10th Cir.1979); (complaint alleging excessive delay in making initial determinations of eligibility for supplemental security income benefits violated procedural due process withstood motion to dismiss); *White v. Mathews,* 434 F.Supp. 1252, 1261 (D.Conn.1976) (delays in scheduling and completion of social security

disability hearings violated procedural due process rights of claimants); *Aiello v. City of Wilmington,* 426 F.Supp. 1272, 1291 (D.Del.1976), *aff'd,* 623 F.2d 845 (3d Cir.1980); (delay in suspension hearing raised potential procedural due process issues which precluded grant of summary judgment); *Perez v. Levine,* 378 F.Supp. 1390, 1395 (S.D.N.Y.1974) ("excessive administrative delay in the furnishing of services can rise to a denial of due process"); *Steinberg v. Fusari,* 364 F.Supp. 922, 937–38 (D.Conn.1973), *vacated and remanded on other grounds,* 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975); (delay in securing decision on appeal in unemployment compensation system constituted a denial of procedural due process); *Nelson v. Sugarman,* 361 F.Supp. 1132, 1136 (S.D.N.Y.1972) (claims that officials failed to implement fair hearing decisions within a reasonable time presented colorable issue of denial of procedural due process); *Custom v. Trainor,* 74 F.R.D. 409, 413 (N.D.Ill.1977) ("Unreasonable administrative delays in commencing payment of benefits can constitute a deprivation of property in violation of the due process clause."); *Andujar v. Weinberger,* 69 F.R.D. 690, 694 (S.D.N.Y.1976) ("allegations of lengthy delays in the delivery of benefits state constitutional claims of denial of property without due process"). State courts have also had occasion to address the issue of administrative delay and procedural due process. *See Chicago and North Western Railroad v. Labor and Industry Review Commission,* 91 Wis.2d 462, 480, 283 N.W.2d 603, 612 (Wis.Ct. App.1979), *aff'd,* 98 Wis.2d 592, 297 N.W.2d 819 (Wis.1980); ("Unreasonable administrative delay can deprive a party of property without due process."); *O'Keefe v. Murphy,* 38 N.Y.2d 563, 568, 345 N.E.2d 292, 294, 381 N.Y.S.2d 821, 823 (1976) ("whenever a delay in an administrative adjudication significantly or deliberately interferes with a party's capacity to prepare or to present his case, the right to due process has been violated."); *Will v. Department of Health & Social Services,* 44 Wis.2d 507, 519, 171 N.W.2d 378, 384 (1969) ("Failure of an administrative agency to schedule and hold required review hearings can relate to a violation of due process").

**23.** In addition to the demands imposed by procedural due process considerations on adminis-

fore administrative agencies performing quasi-judicial functions is not without corresponding duty on the part of those agencies to act within certain time constraints. Time limitations are frequently imposed by the Legislature in recognition of the need for expeditiousness. *See, e.g., Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625, 641–42 (1983). Similarly, time limitations are often imposed by the administrative agencies themselves through the promulgation of rules and regulations pursuant to grants of legislative power in recognition of the need for expeditiousness. *See, e.g., Reed v. Hansbarger*, 173 W.Va. at 261, 314 S.E.2d at 619–20. Finally, time limitations are implicitly imposed by the demands of procedural due process. *See, e.g., State ex rel. Bowen v. Flowers*, 155 W.Va. at 394, 184 S.E.2d at 614.

At times, legislative intent and procedural due process considerations merge to

form the basis for the imposition of specific guidelines to govern the performance of administrative agency functions. For example, in *United States v. Thirty-seven Photographs*, 402 U.S. 363, 372–74, 91 S.Ct. 1400, 1406–07, 28 L.Ed.2d 822, 832–33 (1971), the United States Supreme Court, when confronted with unreasonable delays in the institution and completion of forfeiture hearings under 19 U.S.C. § 1305(a), which authorizes seizure of obscene materials by customs collectors, imposed specific time limitations on United States Customs, stating:

> We ... see no reason for declining to specify the time limits which must be incorporated into § 1305(a)—a specification that is fully consistent with congressional purpose and that will obviate the constitutional objections raised by claimant. Indeed, we conclude that the legis-

---

trative agencies performing quasi-judicial functions in general, complaints before administrative agencies alleging unlawful discrimination raise special procedural due process implications. In *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the United States Supreme Court addressed several of these procedural due process implications. In *Logan*, 455 U.S. at 426, 102 S.Ct. at 1152, 71 L.Ed.2d at 271, the appellant had filed a complaint with the Illinois Fair Employment Practices Commission alleging that he had been discharged from employment on the basis of physical handicap, which was defined as unlawful discrimination under the Illinois Fair Employment Practices Act, Ill.Rev.Stat., ch. 48, ¶ 851 *et seq.* (1979). The statute gave the Commission 120 days within which to convene a factfinding conference and explore the possibility of a negotiated settlement. 455 U.S. at 424, 102 S.Ct. at 1152, 71 L.Ed.2d at 270. Apparently through inadvertence, however, the Commission failed to schedule the conference until five days after expiration of this 120 day period. The Illinois Supreme Court, over the objections of Logan who argued that the Commission's failure to convene a timely conference violated his federal due process and equal protection rights, held that the Commission's failure to comply with the 120 day requirement deprived it of jurisdiction to hear Logan's complaint. *Zimmerman Brush Co. v. Fair Employment Practices Comm'n*, 82 Ill.2d 99, 109, 44 Ill.Dec. 308, 314, 411 N.E.2d 277, 283 (1980). The United States Supreme Court, holding that Logan's right to use adjudicatory procedures established by the Fair Employment Practices Act was a species of property protected by the Due Process Clause

under *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), 455 U.S. at 428–29, 102 S.Ct. at 1154, 71 L.Ed.2d at 273, reversed, stating:

> Logan is entitled to have the Commission consider the merits of his charge, based upon the substantiality of the available evidence, before deciding whether to terminate his claim. Logan's interests in retaining his employment, in disproving his employer's charges of incompetence or inability, and—more intangibly—in redressing an instance of alleged discrimination, are all substantial.... A system or procedure that deprives persons of their claims in a random manner ... necessarily presents an unjustifiably high risk that meritorious claims will be terminated.

455 U.S. at 434–35, 102 S.Ct. at 1157, 71 L.Ed.2d at 277.

The Court went on to state, after rejection a contention that the availability of a post-termination tort action provided Logan sufficient due process, 455 U.S. at 436–37, 102 S.Ct. at 1158, 71 L.Ed. at 278–79, that:

> What the Fourteenth Amendment does require ... "is 'an *opportunity* ... granted at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965) (emphasis added), 'for [a] hearing appropriate to the nature of the case,' *Mullane v. Central Hanover Tr. Co., supra*, [339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865, 873 (1950) ]." *Boddie v. Connecticut*, [401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1971) ]. 455 U.S. at 437, 102 S.Ct. at 1158–59, 71 L.Ed.2d at 279.

lative history of the section and the policy of giving legislation a saving construction in order to avoid decision of constitutional questions require that we undertake this task of statutory construction.[24]

Fortunately, in analyzing the issue of specific time limitations within which the Human Rights Commission must act upon complaints, we are guided not only by the clear legislative intent that agency functions be performed as expeditiously as possible, but also by implicit time constraints enacted as amendments to the Human Rights Act in 1983. *See* 1983 W.Va.Acts ch. 105. In 1983, the Legislature amended the Act to permit a private right of action pending final disposition of complaints before the Human Rights Commission. West Virginia Code § 5–11–13 (Supp.1984). Under the amendment:

The commission shall give a complainant who has filed a complaint a notice of a right to sue forthwith upon (1) the dismissal of the complaint within one hundred eighty days of the filing thereof for

any reason other than a decision on the merits of the case, or (2) the expiration of a period of one hundred eighty days during which period no public hearing has been held on such complaint and the commission and the respondent have not entered into a conciliation agreement to which the complainant is a party: Provided, that the commission shall also give the complainant notice of a right to sue in any case in which, after the expiration of one year, the complaint has not been determined on its merits or a conciliation agreement entered into to which the complainant is a party.

West Virginia Code § 5–11–13(b) (Supp. 1984).

Under this provision, two time periods are significant: one hundred eighty days and one year. The provision evidences a legislative intent that the Human Rights Commission hold public hearings within one hundred eighty days after the filing of the complaint. At the end of this period, a duty on the part of the Human Rights Commission is triggered to provide

**24.** Paradoxically, although the Court saw "no reason for declining to specify … time limits" in *Thirty-seven Photographs,* it vacated and remanded the Second Circuit's affirmance of a district court's similar imposition of time limits in social security disability cases as "unwarranted judicial intrusion" in *Heckler v. Day,* 467 U.S. 104, 119, 104 S.Ct. 2249, 2258, 81 L.Ed.2d 88, 101 (1984). Unsurprisingly, the 5–4 majority opinion authored by Justice Powell did not refer to the Court's prior decision in *Thirty-seven Photographs.* Perhaps a majority of the Court values the recovery of obscene photographs by international travellers over the recovery of benefits by Vermont disability claimants, or perhaps a majority of the Court believes that it possesses a monopoly on the fashioning of equitable relief to redress the denial of due process resulting from unreasonable institutionalized administrative delay. Whatever the reasons for its decision in *Day,* the Court has apparently foreclosed a frequently utilized method for addressing unconstitutional administrative delay in the social security benefits context. *See Day v. Schweiker,* 685 F.2d 19, 24 (2d Cir. 1982), *vacated and remanded,* 467 U.S. 104, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984); *Smith v. Miller,* 665 F.2d 172, 173 (7th Cir.1981); *Blankenship v. Secretary of HEW,* 587 F.2d 329, 336 (6th Cir.1978) (reversing imposition of 90-day remedy, but remanding with instructions to the lower court to require agency to issue regulations providing for specific time period); *Caswell v.*

*Califano,* 583 F.2d 9, 15–18 (1st Cir.1978); *Barnett v. Califano,* 580 F.2d 28, 32–22 (2d Cir. 1978); *White v. Mathews,* 559 F.2d 852, 861 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *but see Wright v. Califano,* 587 F.2d 345, 350–54 (7th Cir.1978). The applicability of the Court's holding in *Day* is uncertain, however, with respect to the imposition of time limits in other administrative contexts. *See Nader v. FCC,* 520 F.2d 182, 207 (D.C.Cir.1975) (ordering FCC to submit a schedule for the expeditious resolution of tariff cases which had been unreasonably delayed); *Like v. Carter,* 448 F.2d 798, 805 (8th Cir.1971), *cert. denied,* 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972); (holding that failure of state officials to act upon applications for welfare benefits within thirty days entitled claimants to have retroactive benefits from the thirty-first day following the filing of their applications); *Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093, 1101 (D.C.Cir.1970) (ordering Secretary of Agriculture to provide the record necessary for review of proceedings to suspend registration of DDT which had been unreasonably delayed within thirty days); *Alexander v. Silverman,* 356 F.Supp. 1179, 1181–83 (E.D.Wis.1973) (ordering imposition of various time limits in the processing of complaints for welfare benefits); *Adens v. Sailer,* 312 F.Supp. 923, 928 (E.D.Pa.1970) (ordering payment of emergency relief "on demand" as soon as eligibility for that relief determined).

the complainant with a right-to-sue letter, an admission by the Commission of its failure to perform its mandatory duty to hold a public hearing within one hundred eighty days. The provision also evidences a legislative intent that the Human Rights Commission enter a final order on each complaint filed within one year after the filing of the complaint. At the end of this period, a duty on the part of the Human Rights Commission is again triggered to provide the complainant with a right-to-sue letter, another admission by the Commission of its failure to perform its mandatory duty to issue a final order within one year. Both right-to-sue letters, in addition to being admissions of the Commission's failure to perform its mandatory stationary duties, would provide foundations upon which to seek extraordinary relief by way of mandamus to compel compliance with those mandatory statutory duties. We also emphatically note that the Commission's duties with respect to complaints filed are not extinguished by issuance of a right-to-sue letter, but are only concluded *"[i]f a suit is filed"* pursuant to a right-to-sue letter under West Virginia Code § 5–11–13 (Supp. 1984).

■■■ We therefore hold that, under West Virginia Constitution art. III, §§ 10 and 17; West Virginia Code § 5–11–10 (1979 Replacement Vol.); and West Virginia Code § 5–11–18 (Supp.1984), the Human Rights Commission has a mandatory duty to hold adjudicatory hearings within one hundred eighty days, and to issue final orders within one year, from the date of filing of complaints upon which it is determined that probable cause exists for substantiating their allegations. Accordingly, we order the Human Rights Commission to immediately issue and serve written notice of hearing on the complaints of petitioners Allen, Francisco, Lucas, and Moore, to begin within ninety days from the issuance of a writ of mandamus in this proceeding.[25] We further note that under West Virginia

Code § 5–11–8(h) (Supp.1984), the Human Rights Commission is empowered to "do all other acts and deeds necessary and proper to carry out and accomplish effectively the objects, functions and services contemplated by the provisions of this article, including the promulgation of rules and regulations ... implementing the powers and authority hereby vested in the commission," and that under West Virginia Code § 29A–5–1(a) (1980 Replacement Vol.), "Each agency shall adopt appropriate rules of procedure for hearing in contested cases." In order to comply with these time limitations it will be necessary for the Commission to coordinate its internal operating procedures. We therefore hold that the Human Rights Commission has a mandatory duty to promulgate rules and regulations pursuant to West Virginia Code § 5–11–8(h) (Supp.1984) specifying internal procedural time limits through which adjudicatory time requirements can be met. *See* Syl. pt. 6, *Meadows v. Lewis, supra.* Obviously, one of these rules should be that hearing dates must be set within six months from the filing of all complaints at the time those complaints are docketed by the Human Rights Commission.

## VII

The sixth issue raised by the petitioners concerns the disposition of a large backlog of cases which are clogging the administrative machinery of the Human Rights Commission and which are delaying disposition of their own complaints. Although the employment of hearing examiners and compliance with time limitations on adjudicatory activities will significantly reduce the amount of delay attendant to the processing of complaints, the problem of delay will remain intractable unless a concerted effort is made to eliminate the enormous backlog of cases now pending. Assignment of blame at this point is a fruitless exercise which only serves to divert atten-

25. Although not parties to this proceeding, we further note that the Human Rights Commission should immediately issue and serve written notice of hearing on the complaints of Douglas T. Davis, whose complaint was docketed over fifteen years ago, and Richard H. Fuller, whose complaint was docketed over three years ago, to begin within ninety days from the issuance of a writ of mandamus in this proceeding.

tion from the key issue: the protection and vindication of basic human and civil rights.

Undoubtedly, the Legislature ought to devote more of this State's resources to the elimination of what it has defined as "contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." West Virginia Code § 5–11–2 (Supp.1984). Those noble words ring hollow to complainants such as Douglas T. Davis,[26] who has been waiting for fifteen long years for the veracity of his complaint to be tested. It is indeed a mockery of justice for the Legislature to sanctimoniously pass a piece of token legislation ostensibly designed to provide victims of the most contemptible forms of unlawful discrimination with affirmative relief to remedy violations of their most basic human and civil rights, while penuriously refusing to provide enough funds to enforce its mandate. It is not surprising that this level of cynicism on the part of our elected representatives engenders a great deal of distrust on the part of the public. The Legislature, however, is not alone responsible.[27]

■ The respondents indicate that the Governor's failure to fill vacant positions on the Human Rights Commission for long periods of time, ranging from eighteen months to three years according to testimony by the Executive Director, resulting in only six of nine positions being filled during the last quarter of 1983, has frequently delayed the disposition of recommended decisions which must be approved by the majority of a quorum of five Commissioners. West Virginia Code § 5–11–5 (1979 Replacement Vol.) provides, "The commission *shall* be composed of nine members ... to be appointed by the governor, by and with the advice and consent of the senate."

(Emphasis added). Therefore, under West Virginia Code § 5–11–5 (1979 Replacement Vol.), the governor has a mandatory duty to immediately fill vacancies on the Human Rights Commission, with the advice and consent of the senate, so as to maintain membership on the Commission at nine members. *See* Syl. pt. 2, *State ex rel. Brotherton v. Moore,* 159 W.Va. 934, 230 S.E.2d 638 (1976).

■ The performance of the Human Rights Commission has also been adversely affected, according to testimony by its Executive Director, by the refusal of the Attorney General to provide legal assistance to the Commission in the execution of its adjudicatory function. This refusal is clearly a violation of the Attorney General's mandatory statutory duty. Under West Virginia Code § 5–11–7 (1979 Replacement Vol.), "The commission may call upon other officers, departments and agencies of the state government to assist in its hearings, programs and projects." Therefore, any officer, department or agency of state government has a mandatory duty, under West Virginia Code § 5–11–7 (1979 Replacement Vol.), to assist the Human Rights Commission upon request in its hearings, programs, and projects. Furthermore, the Legislature has imposed a special duty upon the Attorney General under West Virginia Code § 5–11–7 (1979 Replacement Vol.), which provides, in pertinent part, that "The attorney general of the State shall render legal services to the commission upon request made by the commission or by the chairman or the executive director thereof." Therefore, the Attorney General has a mandatory duty, under West Virginia Code § 5–11–7 (1979 Replacement Vol.), to furnish all legal services required by the Human Rights Commission.[28]

**26.** *See* footnote one, *supra.*

**27.** Indeed, to its credit, the Legislature has directed all the agencies of state government to cooperate with the Human Rights Commission in the eradication of unlawful discrimination. *See* West Virginia Code § 5–11–7 (1979 Replacement Vol.). The Legislature has also shown considerable foresight in its anticipation that the agencies called upon by the Human Rights

Commission bear the expenses incurred in enforcing the provisions of our Human Rights Act.

**28.** Although the term "legal services" is not expressly defined by the Legislature, we note that, particularly given the companion provision contained in the same section of the statute, its meaning is much broader than merely the provision of staff attorneys by the Attorney General. The term "legal" means " 'of or pertaining to

The Legislature, in these respects, has generously bestowed upon the Human Rights Commission substantial power to utilize all the resources available in state government without recompense by the Commission in pursuit of its fundamental objectives. It has established human and civil rights as the highest priority not only of the Human Rights Commission, but also of the Attorney General, and of every executive officer, department, and agency of this State. Although an inadequate alternative to appropriate funding for the Human Rights Commission, the availability of other state resources is a powerful complement provided by the Legislature to a level of direct funding which the Legislature clearly anticipated might prove insufficient. The Human Rights Commission should immediately begin to utilize these broad grants of power both creatively and aggressively in fulfilling its statutory mandates. We note that interpretation of this broad grant of power must be guided by West Virginia Code § 5–11–15 (1979 Replacement Vol.), which provides that "The provisions of this article shall be liberally construed to accomplish its objectives and purposes." Finally, we note that, under his or her oath, the governor is subject to a constitutional mandate to "take care that the laws be faithfully executed." This mandate in West Virginia Constitution art. VII, § 5, casts the governor in the responsible role of insuring that all executive agencies comply fully with their mandatory duty to assist the Human Rights Commission without recompense in the preservation and vindication of the fundamental human and civil rights guaranteed under the Human Rights Act and under our state constitution.

Finally, the Human Rights Commission, despite the aforementioned lack of cooperation on the part of the Legislature, the Governor, and the Attorney General, must share a great deal of the responsibility for the sad state of affairs which now exists. Rather than maximizing its available resources, the Commission uses its lack of funds as a scapegoat for its own misdirection and mismanagement. For example, a relatively sophisticated econometric study prepared by two economics professors at West Virginia University, commissioned by the Human Rights Commission at an undisclosed cost, was submitted in connection with this litigation to support the hypothesis that an increase in agency funding would result in an increase in agency activity. Although this hypothesis is undoubtedly valid, unless of course the agency utilized its increase in funding to commission other econometric studies to validate the hypothesis that even more money would result in even more activity, *ad infinitum,* its self-evidence demonstrates the unfortunate degree of bureaucratization of the Human Rights Commission. The Commission should not waste precious resources on studies while claimants are being denied their constitutional and statutory rights.

With respect to the Human Rights Commission's lack of financial resources, we note that the Modern Budget Amendment, West Virginia Constitution art. VI, § 51, anticipates that the Human Rights Commission's estimate of funds required for the performance of its mandato-

law; arising out of, or by virtue of, or included in law; based upon or governed by.'" *Roberts v. Love,* 231 Ark. 886, 891–92, 333 S.W.2d 897, 900 (1960), *cert. denied,* 364 U.S. 825, 81 S.Ct. 64, 5 L.Ed.2d 55 (1960), *quoting* Webster's New International Dictionary. "In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally an act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed." *Creameries of America v. Industrial Commission,* 98 Utah 571, 580, 102 P.2d 300, 304 (1940). Similarly, in *Van Zandt v. Fort Worth Press,* 359 S.W.2d 893, 895 (Tex.1962), *quoting* Webster's Third New International Dictionary, the court defined "service" as "'action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object.'" Therefore, the Attorney General has a duty to provide such personnel and resources as will assist the Human Rights Commission in the execution of its quasi-judicial functions, including, but not limited to, the provision of such full-time staff attorneys and supporting assistance as the Commission deems necessary to its efficient functioning. Additionally, we note no provision for the reimbursement of the Attorney General for legal services rendered. Therefore, those services are to be provided at no cost to the Human Rights Commission.

ry duties be included in the governor's budget proposal in the absence of public hearings on any reduction in that estimate. West Virginia Constitution art. VI, § 51(D)(9) provides, in pertinent part, that:

> For the purpose of making up the budget, the governor shall have the power, and it shall be his duty, to require from the proper state officials, including herein all executive departments, all executive and administrative officers, bureaus, boards, commissions and agencies ... such itemized estimates and other information, in such form and at such times as he shall direct.

West Virginia Constitution art. VI, § 51(D)(9) further provides that, "The estimates for the legislative department ... and for the judiciary ... shall be transmitted to the governor in such form and at such times as he shall direct, and shall be included in the budget." The governor's duty to include in the budget the estimates submitted by executive departments and administrative agencies is also nondiscretionary in the absence of public hearings on those estimates. In this regard, West Virginia Constitution art. VI, § 51(D)(10) provides that:

> The governor may provide for public hearings on all estimates and may require the attendance at such hearings of representatives of all agencies and all institutions applying for state moneys. After such public hearings he may, in his discretion, revise all estimates except those for the legislative and judicial departments.

Clearly, the governor may reduce the estimate submitted by the Human Rights Commission only "after" public hearings on estimate of funds necessary to enforce its legal mandates. This Court stated in Syllabus Point 1 of *Cooper v. Gwinn, supra,* that, "Inherent in the republican form of government established by our State Constitution is a concept of due process that insures that the people receive the benefit of legislative enactments." In *State ex rel. Steele v. Kopp,* 172 W.Va. 329, 305 S.E.2d 285, 291 (1983), this due process concept was implicitly applied in the budget context in our holding that:

> [I]nasmuch as the regulation of nonintoxicating beer in this State is "essentially for legislative determination," *Hinebaugh [v. James,* 119 W.Va. 162, 192 S.E. 177 (1937)], and the legislature chose to regulate nonintoxicating beer through the creation of the office of the nonintoxicating beer commissioner under "The Nonintoxicating Beer Act," the governor had a duty to submit a budget to the legislature under which the office of the commissioner could continue operations as prescribed by law. [Footnote omitted].

Similarly, the governor must submit a budget to the Legislature under which the Human Rights Commission can perform its duties as prescribed by law.

The absence of commissioners at important agency functions has also contributed to the lack of expeditiousness. The Legislature has imposed substantial duties upon the commissioners. *See* West Virginia Code §§ 5–11–8(a)–(k); –10, –11, and –18 (1979 Replacement Vol. & Supp.1984). For example, under West Virginia Code § 5–11–8(d)(3) (Supp.1984), one commissioner must be present at each adjudicatory hearing. Furthermore, under this same statutory provision, "all decisions and actions growing out of or upon such hearings shall be reserved for determination by the commission." Finally, in addition to the substantial responsibilities imposed by the quantity of decisions rendered by the Commission, West Virginia Code § 5–11–10 (1979 Replacement Vol.) imposes qualitative duties on the Commission with respect to those decisions, mandating that "findings of fact and conclusions of law as specified in section three [§ 29A–5–3], article five, chapter twenty-nine-A of this Code"[29]

---

**29.** The information which forms the basis for these findings of fact and conclusions of law is the record and proposed findings of fact and conclusions of law submitted by the hearing examiner. Under West Virginia Code § 29A–5–3 (1980 Replacement Vol.), "Prior to the rendering of any final order or decision, any party may propose findings of fact and conclusions of law." Under West Virginia Code § 29A–5–1(d)(6) (1980 Replacement Vol.), "any

accompany the Commission's orders made pursuant to adjudicatory hearings. This quasi-judicial aspect of the Commission's responsibilities places great demands upon each of the commissioners in terms of preparation, contemplation, and rationalization. Although some prestige is associated with appointment to the Commission, the Legislature has clearly mandated that membership is not merely honorary or of a volunteer nature, but imposes substantial working obligations requiring a substantial expenditure of time upon those who choose to accept the call to service. In exchange for this substantial service in advancing the cause of human and civil rights, however, the Legislature has provided [30] a relatively insubstantial salary, only $9,125 annually, although members are reimbursed for reasonable and necessary travel expenses actually incurred in the performance of their duties. *See* West Virginia Code § 5–11–5 (1979 Replacement Vol.). We note that while this salary is not much, the performance of agency functions cannot be impeded by the failure of the commissioners to perform their mandatory duties in a timely fashion.[31] Accordingly, at a minimum, we direct all the members of the Commission to meet immediately to consider all the Commission's business, with a particular emphasis upon the disposition of cases awaiting final decision, and adjourn from month to month until the current backlog of cases is eliminated.

Another startling example of agency management involves the expenditure of federal funds expressly granted to dispose of 164 targeted backlog cases awaiting adjudicatory hearings. Among the cases targeted for hearing were those involving petitioners Allen, Francisco, and Lucas. Utilizing funds provided by the Equal Employment Opportunity Commission, two part-time hearing examiners were contracted at $20,000 each for an eighteen month period to dispose of 82 cases each. Although the contract began on October 1, 1981, the first full hearing was not held for almost six months. Many of the hearings scheduled were continued without notice to all of the participants, resulting in the payment of a court reporter on at least two occasions when she was not notified that a hearing had been continued. Finally, in April 1983, nineteen months into the contract, all hearings were ordered continued because of the depletion of funds to hire court reporters. By the end of the contract period in September 1983, no action had been taken on 84 cases, notice had issued on 15 cases on which hearings had not begun, and hearings were begun but not completed on 3 cases.

The respondents complain that, in addition to the provision of an inadequate level of funding, the Legislature has failed to

---

hearing examiner ... shall have the power to ... take any ... action authorized by a rule adopted by the agency ...." We suggest that the Human Rights Commission empower its hearing examiners to make the submission of findings of fact and conclusions of law by the parties mandatory in order to expedite a final decision on the merits by the entire Commission.

**30.** The annual salary of the commissioners is calculated by a legislative formula for each day of status as a commissioner. *See* West Virginia Code § 5–11–5 (1979 Replacement Vol.). As can be seen from this diagram, the Legislature intended that "members ... shall receive ... a salary ...."

**31.** In fact, failure to perform those duties should result in the removal of the recalcitrant commissioner.

adopt certain amendments to the Human Rights Act proposed by the Commission which would facilitate the performance of its statutory duties. We note, however, that the Legislature has done a good job in the drafting of procedure for the Human Rights Commission. Properly administered, the Human Rights Act provides both a simple and expeditious method of protecting and vindicating fundamental human and civil rights. Rather than roaming the halls of the Legislature, seeking political solutions which would effectively deny relief to victims of unlawful discrimination by excusing nonperformance of its lawful duties, the Commission must direct its attention to the administration and enforcement of the Human Rights Act as it is written. The respondents appear to confuse personal inconvenience with statutory unwieldiness. Recently, in *United Mine Workers of America v. Scott,* 315 S.E.2d 614, 632 (W.Va.1984), this Court noted that the "lackluster performance" of the Board of Coal Mine Health and Safety "to a great extent, resulted from self-serving political posturing by Board members, while the lives and limbs of our state's coal miners hang in the balance." In the instant proceeding, the record reflects that the lackluster performance of the Human Rights Commission has also been influenced by what might be described as "avoidance" politics. If the Commission concentrated more on the performance of its lawful duties, rather than on the unbecoming avoidance of those duties, there would be no need for any assistance, with the exception of additional funding, from the Legislature.

Lack of organization, coordination, and established procedure, as well as a counterproductive preoccupation with the bureaucratic aspect of agency functioning, have all contributed to the failure of the Human Rights Commission to perform its mandatory duties in compliance with its legislative mandate and with the demands of due process. The petitioners note that the Commission's own personnel practices have contributed to its failure to comply with statutory mandates. For example, despite having a work force of only twenty employees, the Commission employs a financial clerk to assist its financial officer and a manager of a legal unit that for more than one year consisted of only one attorney. The primary functions of the Human Rights Commission are investigation, conciliation, and adjudication. Until additional funding is available, essential personnel for the Commission are those performing these three functions along with their limited support staff. With the new emphasis on its adjudicatory function, the Commission will obviously need to reconsider its allocation of personnel. Finally, however, the Commission must squarely face the enormous backlog which it has allowed to accumulate. Accordingly, we order the Human Rights Commission to submit, to this Court, within ninety days from the issuance of a writ of mandamus in this proceeding, a specific time schedule for the appropriate disposition of its "inventory" at the time of issuance of a writ of mandamus in this proceeding, with an emphasis upon the expeditious disposition of complaints awaiting adjudicatory hearings, in order to secure the complete elimination of all backlogged cases, i.e., those awaiting hearing for a period exceeding one hundred eighty days.

Although employment of full-time hearing examiners,[32] compliance with time limitations on adjudicatory activities, promulgation of rules regarding internal procedural time limitations, appointment of a full complement of commissioners, assistance of other officers, departments, and agen-

---

**32.** Although the judicial department is not bound by West Virginia Code § 5–11–7 (1979 Replacement Vol.), in the spirit of voluntary cooperation which this provision represents, and in recognition of the quasi-judicial nature of Human Rights Commission adjudicatory hearings, we will direct the Administrative Director of this Court to nominate and compensate a full-time hearing examiner until July 1, 1985, at which time the Human Rights Commission must have completed the personnel and budgeting adjustments necessary to assume full financial responsibility for the compensation of its full-time hearing examiner. In keeping with his actual function, the Administrative Director should designate this hearing examiner as "Chief Administrative Law Judge."

cies of state government, rendition of legal services by the Attorney General, monthly meetings by the entire membership of the Commission, maximization of all available resources by the Commission, and creation of a specific time schedule for the disposition of pending cases, will serve to accelerate the disposition of the backlog of cases now pending before the Human Rights Commission, additional provisions must be made for the complete elimination of the backlog problem. As we have noted, full-time hearing examiners are preferable to part-time hearing examiners for various reasons. It is recognized, however, that under West Virginia Code § 5–11–10 (1979 Replacement Vol.), hearings are conducted "in the county where the respondent resides or transacts business." Therefore, particularly in disposing of the large backlog of cases now pending, some flexibility is needed in order to maximize efficiency while minimizing delay. Accordingly, under West Virginia Constitution art. VIII, § 3, which provides that this Court "shall have the power to promulgate rules ... for all courts of the State relating to ... practice ... which shall have the force and effect of law," and under West Virginia Code § 5–11–7 (1979 Replacement Vol.), which provides that "The commission may call upon other officers, departments and agencies of the state government to assist in its hearings, programs and projects," we will direct the Administrative Director of this Court to obtain the assistance of the West Virginia State Bar, in furtherance of its duty to provide continuing legal education for its membership and in cooperation with the Human Rights Commission, to prepare, as directed by this Court, a manual or benchbook for Human Rights Commission hearing examiners and training seminars to assist in the preparation of a cadre of lawyers, a list of whom is to be delivered to this Court through its Administrative Director, duly licensed to practice law in this State, who will to sit as hearing examiners in our various counties to conduct public hearing as authorized in West Virginia Code § 5–11–8(d)(3) (Supp.1984). We note that this part-time hearing examiner program must be designed to avoid some of the problems associated with the utilization of part-time hearing examiners as previously discussed, with a special emphasis on avoiding any unnecessary delays in the adjudicatory process and conflicts which may arise in lawyers serving as hearing examiners in their geographic area of practice.

## VIII

■ The final issue raised by the petitioners concerns their reimbursement for attorneys fees and other costs associated with the prosecution of this mandamus action. In Syllabus Point 4 of *Nelson v. Public Employees Insurance Board*, 171 W.Va. 445, 300 S.E.2d 86 (1982), this Court held that, "In mandamus proceedings where a public officer willfully fails to obey the law, attorneys fees will be awarded." *See also* Syl. pt. 8, *Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625 (1983). The rationale for the award of attorneys fees in *Nelson*, 171 W.Va. at 451, 300 S.E.2d at 92, applies with equal force in the present case:

> Our statutory law does not contemplate that officers of the executive branch of government, after taking their oath, ... will knowingly disregard their duty to faithfully execute the law.... [T]he constitution explicitly contemplates that public officers *"shall* perform such duties as may be presented by law." (Emphasis added.) W.Va. Const. art. 7, § 1. Citizens should not have to resort to lawsuits to force government officials to perform their legally prescribed nondiscretionary duties. When, however, resort to such action is necessary to cure willful disregard of law, the government ought to bear the reasonable expense incurred by the citizen in maintaining the action. No individual citizen ought to bear the legal expense incurred in requiring the government to do its job. [citations omitted].

An award of attorneys fees is particularly appropriate in the present proceeding given the constitutional implications of the respondents' inaction. Accordingly, we order the respondents to reimburse the petition-

ers for the attorneys fees [33] and other costs associated with the prosecution of this mandamus action.

## IX

For the foregoing reasons, we grant a writ of mandamus compelling the respondents to: (1) place on its docket all complaints tendered that meet the five statutory criteria, including the complaint tendered by petitioner Haid on April 6, 1984; (2) employ at least a full-time hearing examiner, duly licensed to practice law in this State, for the conduct of public hearings authorized under the Human Rights Act; (3) hold adjudicatory hearings within one hundred eighty days, and issue final orders within one year, from the date of filing of complaints upon which it is determined probable cause exists for substantiating their allegations, including the scheduling of hearings on complaints filed by petitioners Allen, Francisco, Lucas, and Moore, within ninety days from the issuance of this writ; (4) promulgate rules and regulations specifying internal procedural time limits; (5) request the Attorney General to provide such full-time staff attorneys and supporting assistance as the Commission deems necessary to assist in the prompt discharge of its duties; (6) request other officers, departments, and agencies of staff government to provide such assistance as the Commission deems necessary to perform its various hearings, programs, and projects; (7) meet immediately to consider all the Commission's business, with a particular emphasis upon the disposition of cases awaiting final decision, and adjourn from month to month with the entire membership of the Commission present until the current backlog of cases is eliminated; (8) submit to the Clerk of this Court, within ninety days from issuance of this writ, a specific time schedule for the appropriate disposition of its "inventory" at the time of issuance of this writ; (9) cooperate with the West Virginia State Bar in the development of a list of lawyers to sit as hearing examiners for the conduct of public hearings; (10) cooperate with the West Virginia State Bar in the development of a hearing examiner manual or benchbook and training seminars to assist in the preparation of the cadre of lawyers for service as hearing examiners; and (11) reimburse the petitioners for attorneys fees and other costs associated with the prosecution of this mandamus action. We will retain jurisdiction over this case [34] in order to secure compliance with our mandates, particularly those which require performance within certain time constraints, and direct the hearing examiner, as an officer of this Court, to supervise their implementation and to report to the Court Administrator periodically on the progress of the Commission in eliminating the backlog of cases now pending.

Writ granted.

---

33. We note that "[t]he reasonableness of the attorneys fees sought to be recovered will be determined by reference to the factors set out in Disciplinary Rule 2–106 of our Code of Professional Responsibility. *See Farley v. Zapata Coal Corp.,* 167 W.Va. 630, 281 S.E.2d 238 (1981)." *Nelson,* 171 W.Va. at 451, 300 S.E.2d at 92. *See also Meadows v. Lewis,* 172 W.Va. at 477, 307 S.E.2d at 646.

34. We previously utilized this method of serving compliance with our mandate in *Perry v. Barker,* 169 W.Va. at 546, 289 S.E.2d at 432. *See also Harrah v. Leverette,* 165 W.Va. 665, 271 S.E.2d 322, 332–33 (1980); *State ex rel. Partain v. Oakley,* 159 W.Va. 805, 822–23, 227 S.E.2d 314, 323 (1976).